SAUNDERS v. BLUEFIELD WATERWORKS & IMP. CO. et al.

(Circuit Court, W. D. Virginia. October 20, 1893.)

1. EMINENT DOMAIN—BY WHOM EXERCISED—FOREIGN CORPORATIONS.
   No corporation, municipal or otherwise, has power to take for public use private property situated in a different state than that of its incorporation.

2. RIPARIAN RIGHTS—WATER COMPANIES.
   A water company having contracts to supply a city and a railroad company with water for its own profit has no greater power, as a riparian proprietor, to take water from an unnavigable stream, than a private individual has.

3. SAME—DIVERSION OF WATER—INJUNCTION.
   The appropriation of the water of an unnavigable stream by a riparian owner, in such quantities as to unreasonably diminish the supply of other riparian owners, is a private nuisance, for which an injunction will lie.

In Equity. Bill by Walter M. Saunders against the Bluefield Waterworks & Improvement Company and others to enjoin the diversion or appropriation of the waters of a natural stream. Preliminary injunction made perpetual.

Statement by PAUL, District Judge:

On the 1st day of June, 1892, the complainant presented his bill to the judge of the circuit court of Tazewell county, Va., and a preliminary injunction against the defendants was awarded, in accordance with the prayer of the bill; and on the 17th day of August, following, the suit was removed into this court by the defendants. The complainant states in his bill that he is a citizen of the state of Virginia, and of the western district of Virginia, and that the defendant company is a corporation chartered under the laws of the state of West Virginia, and a citizen of that state; that he is the owner of a boundary of land containing about 3,000 acres, on which he resides, in the county of Tazewell, Va.; that most of this land is fertile, adapted to the growing of grain and other products common to that section, but that its chief value is for grazing, a large area of it being in meadow; that most of the arable land lies on a rather elevated plateau, but very little of it is watered by the main Bluestone river, and that his main dependence for water for his land is smaller streams, and that, in fact, his main dependence is one small stream known as "Beaver Pond Creek;" that the source of this stream is a bold-flowing spring of pure water, situate near the southeastern portion of his land; that a short distance from its source this stream enters upon his land, and flows for a mile, or more, through the most fertile and productive portion of it; that last year he purchased from one John Bailey 93 acres of land near said spring, and through which said creek runs, almost solely for the water it affords; that said creek runs through much of his meadow land, for draining which he has constructed more than 20 blind ditches which empty into it; that there are a few other small mountain streams on the large expanse of his land, but they cannot be depended upon, and frequently are dry for several months in the year. Complainant then alleges that the defendant company has purchased the right to divert the water of the aforesaid spring, together with some land about it; that it intends to convey the water to the city of Bluefield, in the state of West Virginia, by forcing it through 10-inch cast pipes with powerful engines to be stationed at the spring; that the water to be so taken from the spring is not intended to be returned to the channel of the stream, and cannot be; that, if the defendant company succeed in reaching the water with the pipes and machinery it intends to use, it will take the whole stream, or so deplete it that a running stream will not be left to flow through his land; and that, in consequence, there will be no estimating the damages that will be done to his land and to his business. He further alleges that the defendant company has its employes at work in Tazewell county, in the state

of Virginia, and in the western district of Virginia, in putting down a pipe line preparatory to the removal of the water.

The defendants, W. T. Louder, Alexander Tackett, Henry Tackett, and T. J. Crouch, in their answers, aver that at the time these suits were instituted they were employes of their codefendant, the Bluefield Water Works & Improvement Company, for daily wages, and working under the direction of said company, and that they have not, and never have had, any interest in the subject-matter of these suits.

The defendant company, in its answer, states that it is a corporation, a joint-stock internal improvement company, chartered and organized under the laws of West Virginia, and now, and ever since it was organized, doing business exclusively within the state of West Virginia. It admits that it has purchased of one Carmack Bailey and wife one acre of land, on which there is a large spring known as "Beaver Pond Spring," and asserts that in the conveyance of said land to it by Carmack Bailey and wife it is expressly stipulated that it shall have the right to remove the water from the spring to the city of Bluefield, where it proposes to use it for the purpose of furnishing it to residents of that city for drinking and all other domestic and other purposes, and to supply the Norfolk & Western Railroad Company with it for its trains and shops. It states that, for the purpose of transporting and using the water for the purposes aforesaid, it has at great expense laid a pipe line from its reservoir in the city of Bluefield to the spring, a distance of about three miles; that it has built an engine house near the spring on its land, and has purchased an engine and other valuable machinery, and placed the same in the engine house. It claims that its tract of land, with the spring thereon, lies wholly in Mercer county, in the state of West Virginia; and cites certain acts of the legislature of Virginia, and the report and plat of a survey made in pursuance of said acts, in support of its contention. It claims that under the laws of the state of West Virginia it is an internal improvement company, and that under the laws of that state it has the right to acquire real estate and water for its purposes, either by purchase, if it could agree upon terms with the owner thereof, or, if it could not agree upon terms with the owner, then that it has the right to acquire such private property by instituting condemnation proceedings in accordance with the laws of said state providing for the taking of private property for public purposes; and that, in acquiring private property for its purposes in either of the modes prescribed by the laws of the said state, it was, in so doing, the representative of the state,—standing, as it were, in the shoes of the state,—and protected in its possession of, and title to, the property thus acquired by and through the exercise of the right of eminent domain. It claims that it has thus acquired the said one acre of land and the right to divert the water of the spring; and that the purpose for which it proposes to divert the water is a public use, indispensable to the public welfare; and that the acquisition of this water is necessary for the use to which it proposes to apply it. In its answer the defendant company also admits that it does intend to take, if it lawfully can, about four-fifths of the water from the spring, and convey it to the city of Bluefield, but denies that this diversion of the water will in any way injure the plaintiff or lessen the value of his lands.

At the October term, 1892, of this court, a motion was made to dismiss this suit, by the defendant company, which motion was overruled. A demurrer to the bill was then filed, the grounds of demurrer being as follows: First, that the court has no jurisdiction of the parties nor of the subject-matter of the suit; second, for want of proper parties to the bill; and, third, that the complainant's remedy is at law, and not in equity. The demurrer was overruled. At the same term of the court an order of survey was made, and a surveyor appointed to ascertain and report to the court the true boundary line between the county of Mercer, in the state of West Virginia, and the county of Tazewell, in the state of Virginia, and to show the location of the spring with reference to said boundary line. The surveyor executed the order, and filed his report on the 9th day of January, 1893; but exceptions have been filed to his report, and the same have been considered by the court.

Henry & Graham, for complainant.
A. J. & S. D. May and A. W. Reynolds, for defendants.

PAUL, District Judge, (after stating the facts.)   The first question to be determined is as to the location of the spring,—whether it is in the state of Virginia or the state of West Virginia.   This depends upon the ascertainment of the boundary line between the county of Tazewell, in the state of Virginia, and the county of Mercer, in the state of West Virginia, and the exact location of the spring with reference to this boundary line.

The county of Mercer was formed out of portions of the counties Giles and Tazewell, in the state of Virginia, in 1837, and became a county in the state of West Virginia upon the formation of that state, in 1863.   An act of the legislature of Virginia, passed March 13, 1847, provided for surveying and ascertaining the true boundary line between Mercer county and Tazewell county. In pursuance to the provisions of this act a survey was made, and a plat drawn, which plat, the act further provided, should be "conclusive evidence in all controversies which may arise touching said line."   The surveyor appointed by the court has ascertained the true line as originally surveyed and located, and traced on the plat pursuant to the said act of the legislature of Virginia, and has reported the same to the court.   This report appears to the court to be correct, and the exceptions to it which have been filed must be overruled, and the report confirmed.   According to this report the spring is situate in the county of Tazewell, in the state of Virginia, and within the jurisdiction of the court.   This determines the question as to the location of the spring.

The defendant company claims that it is an internal improvement company, and has the right to take private property for public uses.   Whatever may be its powers conferred by its charter in the state of West Virginia, (and the court has no occasion here to express any opinion on that question,) it will not be contended that the defendant company, having no charter under the laws of the state of Virginia to do so, can exercise such powers within this state.   The determination of the question as to the location of the spring—that it is in the state of Virginia, and not in the state of West Virginia—settles this contention, also, adversely to the claim of the defendant company.   In the opinion of the court, the defendant company possesses, within this state, no greater or higher powers in relation to the taking of private property for public uses without the consent of the owner than a natural person possesses.   It had the power to contract with the city of Bluefield and the Norfolk & Western Railroad Company to supply them with water, just as any natural person has; but such contract could not confer upon it any such power as that which the state may exercise in its sovereign right of eminent domain.

Neither the city of Bluefield nor the Norfolk & Western Railroad Company is a party to this suit.   They are not here claiming that the water of this spring is indispensable to them for public uses.   They have not constituted the defendant company their

agent in any respect to protect or advance their interests. The evidence shows that the only relation the defendant company sustains to the city of Bluefield or the Norfolk & Western Railroad Company is that of a party to certain contracts to furnish these two corporations with water according to the terms of the contracts; and it does not appear that the purpose for which it proposes to take the water and divert it from its channel is for public use, but to fulfill its contracts in the interest of its own private gain.

But, even if this were otherwise,—if the defendant company came as the accredited agent of the city of Bluefield and the Norfolk & Western Railroad Company; even if the city of Bluefield and the Norfolk & Western Railroad Company were themselves the defendants here,—it would make no difference in the condition of this suit touching this branch of the contention; for the city of Bluefield, being a corporation under the laws of the state of West Virginia, could not have the power to exercise the right of eminent domain within the state of Virginia, under its charter from the state of West Virginia, and the Norfolk & Western Railroad Company, although a corporation under the laws of the state of Virginia, could not, as a riparian owner, take water for its engines so as to affect injuriously the rights of other riparian owners; and even if it, as an internal improvement company, needed the water for public uses, the only mode by which it could acquire it without the consent of the lower riparian owners, if at all, would be by instituting condemnation proceedings as prescribed by the laws of the state of Virginia.

The court is therefore of opinion that this controversy must be decided upon the well-known principles of law applicable to the rights of riparian proprietors. These principles are so well settled and so familiar that we ought to have little difficulty in applying them to the questions involved.

Mr. Gould, in his treatise on the Law of Waters and Riparian Rights, (section 205,) says:

"Each riparian proprietor has a right to the ordinary use of the water flowing past his land for the purpose of supplying his natural wants, including the use of the water for his domestic purposes and for his stock. * * * The term 'domestic purposes' extends to culinary and household purposes, and to the cleansing and washing, feeding, and supplying the ordinary quantity of cattle. * * * But railway companies, as riparian owners, are not entitled to take water for their engines so as to affect injuriously * * * the right of other riparian owners, such use not being domestic; and the fact that they do not require the water for domestic use does not entitle them to it for other purposes of a different character."

Mr. Minor, in the third volume of his Institutes, (not yet published,) has exhaustively investigated the subject, collated the authorities, and states the law. He says:

"Prima facie the proprietor of each bank of a private (or unnavigable) stream is the proprietor of half the land covered by the stream; but there is no property in the water, but only a mere usufruct, while it passes along. Every proprietor has an equal right to use the water which flows in the stream, and to have the full benefit thereof, in the state in which it exists naturally, as it was wont to run, (currere solebat,) uncontaminated and sub-

stantially undiminished (save for the most necessary uses of life) by the acts of landowners above him, and without prejudice from the acts of the proprietors below him; and that, not in consequence of any presumed·grant from any one, but ex jure naturae,—by the law of nature. 'Aqua currit et debet currere' is the language of the law. Though he may use the water while it runs over his land, he cannot unreasonably detain it, or give it another direction, and he must return it to the ordinary channel when it leaves his premises. Without the consent of the other proprietors who may be affected by his operations, no riparian owner can either divert or unreasonably diminish the quantity of water which would descend to the proprietors below, nor pollute it, nor throw the water back upon the proprietors above." 3 Minor, Inst. pp. 15, 16, and the long list of authorities there cited.

"By the general law applicable to running streams, every person through or past whose land a natural water course runs has a right to the reasonable use of the water, and no proprietor, above or below, has a right to divert or obstruct it. This right is not an easement, but is inseparably annexed to the soil, and passes with it." Carpenter v. Gold, 88 Va. 552, 14 S. E. Rep. 329.

Would the removal and diversion of the water of the spring, the source of the stream in question, in the manner and quantity proposed by the defendant company, unreasonably diminish the quantity of water which would descend to the complainant's land below? It appears from the evidence that the stream from this spring first enters upon the complainant's land a short distance below the spring, flows through it for several hundred feet, then leaves it, and flows through others' lands for a distance of between one-fourth and one-half mile, then re-enters upon complainant's land, and flows through it for a distance of a little more than a mile. Between the spring and the point at which the stream first enters upon the complainant's land, as the evidence shows, there are no tributaries of sufficient size to be considered. The complainant's right to the use of the water which flows in the stream, and to have the full benefit thereof, uncontaminated and substantially undiminished (save for the most necessary purposes of life) by the acts of the landowners above him, is fully established at the point where the stream first flows upon his land, and is as valid in respect to the several hundred feet of its course through his land which it first makes as it is in respect to the mile or more of the course it makes through his land lower down, after its second entrance on it; and the complainant claims that he purchased that portion of his land through which the stream first flows mainly for the benefit of the water which the stream affords, and that he would not have purchased it but for that consideration. The defendant company denies that the removal and diversion of the water, as proposed by it, would in any way injure the complainant, or lessen the value of his land, and contends that there would be an abundance of water left for all lawful and necessary purposes. From measurements made by the defendant company's engineer, the flow of the spring for each 24 hours, at different dates, is shown to be as follows: January 28, 1892, 1,100,968 gallons; February 9, 1892, 2,227,548 gallons; April 19, 1893, 1,222,793 gallons; April 29, 1893, 2,281,983 gallons. The engineer states that the measurement taken on January 28th is low on account of the ground and the small tributaries being frozen up; that taken on February 9th is high on account of heavy

rains two days before it was taken; that taken on April 19th is low on account of dry weather; and that taken on April 29th is high on account of heavy rains two or three days before. He also states that during heavy rains it is impossible to give an accurate measurement of the spring, on account of its overflowing its banks. No measurement has been made at any time during the summer or autumn season. Any calculation based upon the flow of the water during a rainy season would not be proper, because these are only occasional seasons, infrequently occurring, and of short duration. The calculation, to be correct, must have reference to the flow of the water during the regular seasons of the year, and provision should be made against the scarcity of water in the dry seasons, when it is most needed. The evidence shows that the defendant company has provided itself with a pump and machinery with which it can remove from the spring 1,271,600 gallons of w⁻ter in each 24 hours. This would exceed the total flow of the         ng on the 28th of January by 170,632 gallons, and of its flo⹀.         ril 19th by 48,807 gallons. It would be more than half the tot⹀ .ow in the rainy seasons, and would, no doubt, equal or exceed it at any regular season of the year. The defendant company states in its answer that the Norfolk & Western Railroad Company's demand for water will be greatly increased in the near future. It is conceded that the city of Bluefield is a growing place, and necessarily the demand for water by its inhabitants must increase with its growth in population. What quantity of water will be required to supply such increased demands can only be conjectured, but must be very large. The defendant company concedes that its purpose is to take about four-fifths of the water, and in the opinion of the court this would unreasonably diminish the quantity of water which would descend to the complainant's land below; especially, as the defendant company does not claim that it wants the water for its own domestic purposes, but concedes that it intends to make of it a marketable commodity. But with the machinery provided to supply any demand, to the full extent of the flow of the spring, the quantity of water that would be taken by the defendant company would be limited only by the demand for it, and this demand, continually increasing, would ultimately take all the water of the spring.

But the complainant's riparian rights are equally valid in respect to the longer course, of a mile or more, which the stream makes through his land after its second entrance upon it, lower down, as in respect to the shorter course which it makes through his land at first. Between the point at which the stream leaves his land, after its short course through it, and the point at which it again enters upon it to make its longer course through it, a distance of something less than half a mile, the stream receives the water from John A. Bailey's spring branch and from Wilson creek. The defendant company's engineer's measurement of the flow of the stream after receiving these tributaries, taken at a point about 800 feet above the point at which it enters upon the complainant's land for the second time, showed the quantity of water

for 24 hours as follows:   April 19, 1893, 2,342,085 gallons; April 29, 1893, 7,562,932 gallons.   The engineer states that the low measurement on April 19th was on account of dry weather, and that the high measurement on April 29th was on account of heavy rains two or three days before.   No measurement appears to have been taken at this point, or at any other point between where the stream leaves the complainant's land after its first short course through it and where it re-enters upon it, at any other time, either in the winter, summer, or autumn season. The date of April 19th may be taken as a fair average date among the seasons.   From the measurements taken, the court can make no closer approximation.   On that date, at the point stated, the flow of the water in the stream was 2,342,085 gallons.   Taking from this the capacity of the pump and machinery of the defendant company to remove and divert the water, to wit, 1,271,600 gallons, and only 1,070,485 gallons, which would be less than one-half the water, would be left to flow upon the complainant's land at its entrance thereon for the second time to make a course of more than a mile through it.   This, in the opinion of the court, would be an unreasonable diminution of the water which would descend to the complainant's land below, especially as it is not wanted by the defendant company for its own domestic uses, but to sell for its own profit to other parties, who have no riparian rights in the stream.

Upon a careful consideration of the evidence in this cause, and of the law applicable to the same, the court is of opinion that the removal and diversion of the water of the spring in question, in the manner and quantity which would be removed and diverted by the proposed operations of the defendant company, would be an unreasonable diminution of the quantity of water which would descend to the land of the complainant, who is a riparian proprietor below, and would deprive him of his equal right to use the water which flows in the stream, and to have the full benefit thereof in the state in which it exists naturally, as it was wont to run.   "Accordingly, the diversion of a natural stream is a private nuisance, and therefore, from an early period, the courts of equity have granted relief by way of injunction, in such cases, at the suit of the injured party.   The jurisdiction is founded upon the notion of restraining irreparable mischief, or of preventing vexatious litigation or a multiplicity of suits."   Carpenter v. Gold, 88 Va. 553, 14 S. E. Rep. 329.   "And it is to be specially observed that if the use be unreasonable, or otherwise illegal, the party whose rights are affected may maintain an action, although there may have been no actual, but only potential, damage,—that is, a possible future injury from the present invasion of the right."   3 Minor, Inst. p. 17, and authorities there cited.

The preliminary injunction must be made absolute and perpetuated.