### THE KANSAS.

### BUTLER et al. v. THE KANSAS.

(District Court, D. Massachusetts. May 10, 1898.)

### No. 876.

CARRIERS·BY SEA—BILL OF LADING—LOSS OF GOODS.
In a bill of lading for old metal, a provision that if the goods be prevented, "by any cause," from going by the steamer specified, the carrier may forward them by the succeeding steamer of his line, warrants him in leaving them for the next vessel, which sails four days later, when the space reserved for the goods is needed for more perishable articles. And his failure to notify the shipper that they are so left does not make either him or the vessel liable for their loss in transit by a peril of the sea, though the shipper procures insurance on the goods only by the vessel specified, whereby he is unable to recover on the policy.

This was a libel in rem by Thomas Butler and others against the steamship Kansas to recover for the loss of goods shipped.

Henry M. Rogers, for libelants.
Ball & Tower, for respondent.

BROWN, District Judge. This is a libel in rem to establish a maritime lien upon the steamship Kansas for failure to deliver at Liverpool 32 barrels of old metal. ·The Kansas is one of the Warren Line of steamships (so called), running between Boston and Liverpool, and was advertised to sail, and did sail, from Boston, January 26, 1897. On January 23d a bill of lading was delivered to the libelants, the material parts whereof are as follows:

"Received, in apparent good order and condition, from Thomas Butler & Co., to be transported by the good British steamship Kansas, now lying in the port of Boston, and bound for Liverpool," etc., "* * * thirty-two barrels old metal, * * * to be delivered * * * at the port of Liverpool (or so near thereto as she may safely get) unto order, or to his or their assigns. It is mutually agreed that, in case the whole or any part of the goods specified herein be prevented by any cause from going in the said steamship, the carrier shall have liberty to forward them by succeeding steamship or steamships. * * * In witness whereof, the master or agent, on behalf of the owners of said ship, hath affirmed to two bills of lading, all of this tenor and date," etc. "Warren & Co., Agents,
"Per A. J. Noether."

The bill of lading is indorsed, "[Signed] Thomas Butler & Co."
Warren & Co. were agents for a number of steamships, known as the "Warren Line." In this line, besides the Kansas, owned by the claimant, the Kansas Steamship Company, Limited, a British corporation, was the Angloman, a steamship owned by the British & North Atlantic Steam-Navigation Company. The Angloman sailed January 30, 1897, four days after the Kansas, and was the next suc-

ceeding steamship of the Warren Line. The metal was received on the dock January 22d. A short time before the Kansas sailed, it was found that, after stowing the rest of the cargo, there was no room on the Kansas for the metal. It appeared in evidence that freight of this character is customarily loaded last. The loading of the various vessels was in charge of Warren & Co.'s superintendent, and not of the masters of the vessels. The merchandise was shipped upon the Angloman, and was totally lost, through perils of the sea, when the vessel was wrecked on the coast of Wales on or about the 10th day of February, 1897. The libelants insured their cargo on the Kansas on January 23d, for $2,500, and had no insurance by any other ship. January 25th a draft was drawn on their consignees; and the draft, with insurance policy and bill of lading attached, was discounted by Kidder, Peabody & Co., of Boston, and sent forward for collection. In consequence of the loss of the Angloman, the draft was unpaid, and was protested. The insurance company refused payment, as they had insured by the Kansas only. The libelants were not personally informed that the goods had not gone on the Kansas until after the loss of the Angloman. The libelants seek to recover the value of the merchandise lost, with the expenses of protest of their draft.

The libelants contend that the bill of lading was a positive engagement that the goods should go by the Kansas, that they were in the custody of the ship Kansas, and that there has been a breach of contract, in the failure to put the goods on the Kansas, and deliver them by her at Liverpool. It seems clear, however, that the shipping of the goods upon the Angloman instead of upon the Kansas was, under the circumstances, in accordance with the express provisions of the contract, and not contrary thereto. The condition of the right to ship on a succeeding vessel was that the goods should be "prevented by any cause from going in the said steamship." Conceding that this right should not be exercised arbitrarily, and that the cause must be reasonable, yet as another vessel was to depart within the brief period of four days, and as there was, so far as appears, no reason to believe at the time that the transportation upon the second vessel would not as well fulfill the purpose of the shipper of these goods, which could not deteriorate by delay, I find, upon the evidence, that the right was reasonably exercised. It is obviously difficult for those in charge of a freighting line, whose vessels carry mixed cargoes, to foresee with exactness the amount of freight that will arrive, or the precise manner of stowing it. In this case the usual place of stowage for articles of this character was reserved until a short time before the Kansas sailed. There were other articles, more or less perishable in character,—bacon, apples, cheese, cattle, and sheep,—naturally entitled to preference, and the metal was left out because the ship was loaded to her limit. A contract which provides for such contingencies as arise in the ordinary course of business is not unreasonable, and should receive a construction that gives it effect. The contract must be considered, therefore, not as an absolute engagement to send the goods on the Kansas, but as giving a right to send them on a later vessel if reasons of the character existing in the

present case should arise. This conclusion would follow whether the contract were held to be with the Warren Line, so called, or with the owner of the Kansas. I am of the opinion, therefore, that there is no liability attaching either to the vessel or to the owner for failure to deliver the goods.

The libelant claims, however, that in reliance upon the bill of lading he insured the goods only by the Kansas, that it was the carrier's duty to notify him of a change of vessel, that he was not notified, and that his loss was the direct result of a failure to notify. It is, in my opinion, unnecessary to determine whether the notice of a change of vessels given to Farley & Sons, the brokers and freight forwarders, was notice to the libelants. If the carrier is not otherwise liable, it cannot be liable for the reason that the shipper has failed to insure. The libelants were notified by the so-called bill of lading that the goods might go upon another vessel. If they voluntarily disregarded this contingency, they took their chances. If they supposed the contract to be an absolute engagement to carry the goods upon the Kansas, they relied upon an erroneous construction thereof, and not upon the actual contract. In either event the carrier is not responsible for their failure to secure insurance that covered the actual risk. Marx v. National Steamship Co., 22 Fed. 680–685; Red Wing Mills v. Mercantile Mut. Ins. Co., 19 Fed. 115; The Carolina Miller, 53 Fed. 136. The libel will be dismissed, with costs to the claimant.