## Case No. 1,910.

### BROADWELL v. BUTLER et al.

### SAME v. KEYS et al.

[6 McLean, 296;[1] Newb. 171.]

Circuit Court, D. Ohio.    Oct. Term, 1854.[2]

CARRIERS—DELIVERY—REASONABLE TIME—EXCUSE FOR NONDELIVERY — BILL OF LADING — EVIDENCE — "PRIVILEGE OF RESHIPPING"—CUSTOM AND USAGE.

1. It is a part of the obligation of a common carrier, to deliver the property placed in his charge within a reasonable time; but what is a reasonable time depends on the circumstances of the case.

[Cited in Marx v. National S. S. Co., 22 Fed. 684.]

[See Vose v. Allen, Case No. 17,005; Liverpool & G. W. Steam Co. v. Suitter, 17 Fed. 695.]

2. The words, "privilege of reshipping," in a bill of lading, are intended for the benefit of the carrier, but do not limit his responsibility.

3. If he undertakes to deliver goods within a specified time, he is liable for any delay beyond that time, unless the cause of the delay is within the exceptions in the bill of lading, or occasioned by the act of God, or the public enemy.

4. The subsidence of the water in the Ohio river, preventing a boat from passing up the falls with its cargo, is not strictly within any of the reasons which excuse a carrier for the failure to deliver goods within a reasonable time.

[Cited in The Coventina, 52 Fed. 158.]

5. But proof of a usage long established, uniform and well known. to the effect, that under a bill of lading in the usual form, with the words "privilege of reshipping" inserted, a boat from below bound to any place above the falls, may wait there for a rise of water for a month or more, without incurring liability for not delivering the cargo, in a reasonable time, is admissible.

[Cited in Dorris v. Copelin, Case No. 4,011; The Coventina, 52 Fed. 158.]

6. The proof in this case is conclusive of the existence of such usage; and therefore, the detention of the boat with its cargo, for thirty days or upwards, does not deprive the owner of a right to recover full freight to the place of consignment, if the property was delivered with promptness, after the first rise in the river.

[In admiralty. Libels by James M. Broadwell, as master. for the owners of the steamboat Princess No. 3, against J. C. Butler & Co., and against Keys, Maltby & Co., for the recovery of freight alleged to be due. Decree for libellant.]

Lincoln, Warnock & Smith, for libellant.
Coffin & Groesbeck, for respondents.

LEAVITT, District Judge. As the questions in these cases arise on nearly the same facts, and depend on the same principles, they will be considered together. They are suits in admiralty, brought by the libellant as master, for the owners of the steamboat Princess No. 3, to recover freight alleged to be due for the transportation, in the first

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Newb. 171. states that this case was determined in the district court.]

named case, of a large quantity of molasses, and in the other, of sugar, from New Orleans to Cincinnati.

The facts necessary to be noticed, in the decision of the points presented, are, that on the 19th of February, 1853, the agents of the said Butler & Co. shipped, on the Princess No. 3, at New Orleans, four hundred barrels of molasses, and the agents of Keys, Maltby & Co., at the same time and place, shipped on said boat, one hundred and eighty-nine hogsheads of sugar, consigned to those houses respectively, at Cincinnati. Bills of lading were signed by the libellant, in both cases, as master, in the usual form, undertaking for the delivery of said property to the consignees, at Cincinnati; the dangers of the navigation and of fire only excepted, at a rate of compensation stated in the bills. To both the bills of lading were attached, the words, "privilege of reshipping." Within a day or two after the date of the bills of lading, the boat proceeded up the river, and arrived at the foot of the falls of the Ohio river, without accident or detention, on the 5th of March. It is admitted by the answers of the respondents, that their agents, at the time of the shipments, were apprised of the fact that, from the size of the steamboat, it could not pass through the locks of the canal around the falls, and consequently, that the cargo could not reach its destination, on that boat, in any other way than by passing over the falls. It is also an admitted fact, that on the arrival of the boat at the falls, the river had fallen so low, that there was not depth of water sufficient to permit its passage over them, and that it continued in that stage for about one month. At the expiration of that time, there was a swell in the river, which enabled the boat to proceed up; and, on the 10th of April, it arrived at Cincinnati, and the cargo was delivered to the consignees. It is satisfactorily proved, that the time usually occupied in making the trip from New Orleans to Cincinnati, in favorable weather, and no accident occurring, is from ten to twelve days. There was therefore a detention of the boat, at the falls, of upwards of thirty days. It is clearly established by the evidence in these cases, that during the period of the detention of the boat, there was a decline in the price of molasses, at Cincinnati, of from two to five cents the gallon, and in sugar from one-eighth to three-eighths of a cent in the pound. The respondents respectively allege, that they are entitled to a set-off against the claim for freight, equal to the decline in the market value of the articles shipped, occurring while the boat was delayed at the falls. And this is the principal question arising in these cases.

The respondents insist, that the libellant failed to deliver the property shipped, according to the obligation of the bills of lading, and that the owners of the boat are therefore liable for any loss sustained by reason of such failure. They insist, that by the terms of the bills of lading, the carrier was bound to deliver the cargo, with all practicable diligence, and that if, by reason of low water at the falls, the boat could not pass up, he was bound to reship, or by some other means ensure the prompt delivery of the property to the consignees. On the other hand, the libellant contends, that the molasses and sugar were shipped by the agents of the respondents, with a knowledge that the falls of the Ohio might present an obstruction to the upward passage of the boat, and that his contract, by a fair construction of the bills of lading, was to deliver the cargo, with reasonable diligence, in contemplation of such obstruction; and that proceeding to Cincinnati with promptness and diligence, as soon as the state of the river would permit, and safely delivering the cargo there, was a full discharge of his contract as contained in the bills of lading. The libellant also insists, that the words, "privilege of reshipping," inserted in the bills of lading, instead of creating an obligation to reship at the falls, in case of low water, are to be construed as a privilege, enuring to his benefit, and designed to secure the right, should the interests of the owners of the boat require it, to reship the cargo at the falls, or at any other point.

I am not aware of any judicial decision, settling the legal import and construction of these words, with reference to a state of facts similar to those presented in these cases. The phrase "privilege of reshipping" is one in common use, in carrying on the commerce of the western waters; and questions have been of frequent occurrence, in suits against carriers to recover for the loss of, or injury to property, where there has been a reshipment under the right secured by these words in the bill of lading. But I know of none—nor have any been referred to—determining their effect, in a case asserting a loss, from a failure to deliver within a reasonable time. In the cases referred to, involving liability for loss or damage, it is well settled, that the privilege of reshipping in a bill of lading, is intended for the benefit of the carrier, but does not limit his responsibility. He is bound for the safe delivery of the property committed to him, precisely as if such words were not used in the bill of lading. The stringency with which the law holds him to this liability is well known, and need not be here stated.

That it is a part of the obligation assumed by a carrier of goods for hire, to deliver them within a reasonable time, is not controvertible. But what shall constitute a reasonable time, depends on the peculiar circumstances of the case. 1 Pars. Cont. p. 657; Fland. Shipp. 312. And this is the principle which must govern, in giving a construction to these bills of lading. No time is stated in them, within which the carrier obligated himself to deliver the goods. If such a stipulation

had been a part of the contract, there would have been a liability for any delay beyond that time, unless it was occasioned by the act of God, or the public enemy; or was owing to the usual perils of navigation or fire, which are expressly excepted in the bills of lading. In strictness, the subsidence of the water in the Ohio river, which prevented the boat from passing over the falls, was not a cause of delay, which within any of these principles would excuse the carrier from the obligation imposed by law, to deliver the property within a reasonable time. It was practicable to have delivered the cargo at Cincinnati, by draying the molasses and sugar around the falls, and reshipping on other boats. But this would have been attended with very considerable expense to the carrier, and some loss and injury to the cargo. Was the carrier bound to incur this expense, and was he justified in detaining the property at the falls, awaiting a rise in the river? Apart from all extrinsic facts, there would seem to have been an obligation on the carrier to avail himself of all the means within his power, to forward the sugar and molasses to the consignees, in the fulfilment of his undertaking, according to the legal import of the bills of lading, to deliver them within a reasonable time. But it is insisted, that the uniform usage among those connected with the commerce of the Ohio and Mississippi rivers, either as shippers or carriers, sanctions a different construction; and that, in conformity with that usage, the libellant in these cases was justified in waiting at the falls, till there should be a stage of water that would enable the boat to pass up.

That evidence of such usage is admissible, seems clear upon the authorities applicable to the subject. It is well settled, that a written contract cannot be varied, controlled, or contradicted by parol proof. But in the case of The Reeside [Case No. 11,657], Judge Story said, "the true and appropriate office of a usage or custom is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising not from express stipulations, but from mere implications or presumptions, and acts of a doubtful or equivocal character. It may also be admitted to ascertain the true meaning of a particular word, or of particular words in a given instrument, when the word or words have various senses," etc. In the case of Wayne v. The General Pike, 16 Ohio, 421, it was held, that where terms used in a bill of lading, have by usage acquired a particular signification, the parties will be presumed to have used them in that sense; but usage will not be permitted to control the terms used, unless it is established by clear and satisfactory proof; other decisions to the same effect have been made, to which it is not deemed necessary specially to refer. At this day, there can be no doubt, that proof of usage is admissible in explanation of the intention of the parties, if that intention is doubtful or equivocal. And when clearly proved, it will be regarded as in the contemplation of the parties, at the time the instrument was executed, and as virtually embodied in it. In 1 Pars. Cont. p. 661, it is said, that "usage so long established, so uniform, and so well known, that it may be supposed the parties to the contract knew it, and referred to it, becomes, as it were, a part of the contract, and may modify in an important manner the rights and duties of the parties."

The evidence of a usage fixing the meaning and construction of the words, privilege of reshipping, fully meets the requirement of these authorities. A number of witnesses, of high standing and intelligence, and great experience, in the commerce and business of the west, embracing both shippers and carriers, say, that this phrase has been known to them for many years; and that when used in shipments from below, to any point above the falls of the Ohio, it is intended for the benefit of the carrier; leaving it to his choice to reship or not, as he may deem most for his interest; but it is never understood as creating an obligation to reship. These witnesses say, in reference to the obstruction at the falls of the Ohio, the words not only do not import the duty of reshipping, but that in case of inability to pass the falls from low water, the carrier incurs no liability for the detention, though it should be for an entire season. And several of the witnesses testify, that in all cases where it is intended to impose the obligation to reship, the words, "to be reshipped," are uniformly used. The proof therefore of a well known and established usage, in the particular referred to, is full and satisfactory. It results, that the libellant has not violated his contract by detaining his cargo at the falls for the period of something more than thirty days, and is therefore entitled to a decree for full freight to Cincinnati, according to the rates specified in the bills of lading, with interest thereon from the time it accrued.