MARX and another *v.* NATIONAL STEAM-SHIP Co.

*(District Court, S. D. New York.* November 29, 1884.)

1. SHIPPING—THROUGH BILL OF LADING—CONSTRUCTION.
   A ship's contract is to be strictly construed in favor of the shipper, in respect to the vessel designated to carry the goods, and any change of vessel not permitted by the bill of lading will be at the risk of the carriers.

2. SAME—TRANSHIPMENT—CHANGE OF VESSEL.
   The respondents gave a bill of lading at Marseilles for goods shipped on the steamer E. for London, to be there transhipped for New York "on the steamer C., or by other steamer, or following steamer of this line, for which the goods shall arrive in time; * * * and if said steamer be prevented, from any cause, from proceeding in the ordinary course of her voyage, to have liberty to tranship the goods by any other steamer; * * * the carriers not to be liable for any loss or damage done while the goods are not actually in their possession." On the arrival of the E. at London, the C. had left three days before, and the respondents, having chartered two of their other vessels to the government, would have no steamer ready to sail for New York for three weeks, and they accordingly transhipped the goods upon a steamer of a different line, upon which the goods were injured. By the usage in London it was understood to be obligatory to send goods by vessels of another line if there was likely to be a detention of more than a week after the ordinary sailing days. *Held,* that transhipment on the vessel of another line was justifiable under the terms of the bill of lading, though the C. sailed on her usual voyage some two weeks afterwards; and that the defendants were not liable for the damage.

3. SAME—CONSTRUCTION.
   Particular clauses of a bill of lading should be construed with reference to its general purposes, as indicated by its various clauses, taken together, as well as the surrounding circumstances and the usages and customs of business.

In Admiralty.

*Scudder & Carter* and *Geo. A. Black,* for libelants.

*John Chetwood,* for respondents.

BROWN, J. This libel *in personam* was filed to recover for the damages done to 35 drams of glycerine in the course of transportation from Marseilles to New York, for which the respondents had issued a through bill of lading. The goods were shipped at Marseilles on board the steamer Euphrate. The bills of lading, dated February 17 and February 23, 1881, provided that the goods should "be forwarded by the steamer Euphrate to London, and to be then transhipped in and upon the steam-ship called the Canada, whereof is master, for the

present voyage, Robinson, or whoever else may go as master, in said ship lying in the port of London, and bound for New York, * * * and failing shipment by said steamer, then by other steamer, or following steamer of this line, for which the goods shall arrive in time, * * * and are to be delivered subject to the following exceptions and conditions, viz.: * * * The National Steam-ship Company, limited, or its agents, or any of its servants, are not to be liable * * * for any claims for loss, damage, or detention to goods under through bills of lading, when the loss or detention occurs, or damage is done, while the goods are not actually in the possession of the National Steam-ship Company, limited, or shipped on board the National Steam-ship Company's, limited, steamers. * * * In the event of said steamer being prevented from any cause from commencing or pursuing this voyage, or putting back to London or into any port, or otherwise being prevented, from any cause, from proceeding in the ordinary course of her voyage, to have liberty to tranship the goods by any other steamer."

On the margin of the bill of lading was a statement that a vessel sailed every Wednesday from London to New York. Six steamers were usually employed in the respondents' line, sailing from London, as the proof shows, not with entire regularity at specified intervals, but usually one in every week or 10 days. About this time, however, three of the respondents' vessels, the Queen, the France, and the Holland, were chartered to the British government for the transportation of troops, to-wit: on December 29, 1880; February 15, 1881; and March 8, 1881, respectively. The Euphrate arrived in London on March 7th. The steamer Greece, of the respondent's line, had left London for New York on March 3d. The Canada was absent on her voyage to New York; she subsequently arrived, and sailed from London to New York on March 29th. The respondents, after the charter to the government of the three vessels above specified, had no other steamer that they could dispatch between the third of March and the sailing of the Canada on the 29th. The evidence on the trial showed that it was usual and customary, when goods were received at London, to be dispatched under a through bill of lading, to forward them by a steamer of some other line in case the goods were likely to be detained upwards of a week beyond the next usual sailing day. The respondents, accordingly, finding that they would have no vessel of their own for some three weeks after the Euphrate arrived, transhipped the goods in question on the thirteenth of March to the steamship City of London, belonging to another line, on board of which it is conceded that the negligence complained of and the loss in question arose. The City of London was not immediately libeled for the recovery of the damage to the glycerine; and upon her return trip she is supposed to have been lost, as she has never since been heard from. In seaworthy qualities and in her rating she was superior to the steamers of the respondents' line.

The case turns wholly on the question of the authority of the respondents, under the circumstances stated, to tranship the goods in question on board any other steamer than one of their own line. This question depends upon the proper construction of the bill of lading. The exception that the respondents' company should not be liable for any damage done while the goods were not actually in its possession, or shipped on board its steamers, is a valid exception, and absolves the respondents from liability for this loss, provided the goods were lawfully transhipped on board the City of London. The libelant contends, however, that the conditions specified in the bill of lading, under which alone the respondents were authorized to put the goods upon the steamer of any other line, did not arise. If that contention is correct, then the respondents were bound by the contract of the bill of lading to retain the goods and to transport them to New York upon one of their own steamers; and for their violation of this contract, in shipping them on the City of London, they would be responsible for the loss. *Bazin* v. *Steam-ship Co.* 3 Wall, Jr., 229; 5 Meyers, Fed. Dec. 521; *Goddard* v. *Mallory*, 52 Barb. 87; *Goodrich* v. *Thompson*, 4 Robt. (N. Y.) 75; *Trott* v. *Wood*, 1 Gall. 443.

The libelant's counsel, in support of this contention, relies upon the fact that the Canada was the first steamer that sailed after the arrival of these goods in London; that she is the only steamer referred to by the words, "in the event of *said steamer* being prevented," etc., in the last clause of the bill of lading above quoted; and that the Canada was not "prevented, from any cause, from commencing or pursuing her voyage;" that the respondents were therefore bound to retain the goods in London for the 22 days that elapsed between their arrival by the Euphrate and the usual sailing of the Canada; and, consequently, that the transhipment on the City of London, on the 13th, a week after their arrival, was unauthorized, and at the respondents' risk. This reading of the bill of lading is not, I think, justified by a comparison of its various parts with one another, and still less, when interpreted in the light of the prevailing usage in regard to transhipment by other lines, established by the evidence. The general object designed to be secured by the various provisions of this bill of lading is obviously the dispatch of the goods to their destination, without unnecessary or unreasonable delay in the transhipment. Upon a bill of lading like this, given at Marseilles, and containing various clauses providing for the substitution of some other vessel for the Canada in London, there is no reason to suppose the parties contracted with any special reference to transportation upon the Canada. Her name was doubtless put in the bill of lading at Marseilles, simply as one of the vessels of the respondents' line, without any intent to limit the transportation to her. The words following the Canada's name in the bill of lading clearly show the general intention to promote dispatch, by the express provision, that "failing shipment by said steamer, [*i. e.*, the Canada,] then [to be transhipped] by other

steamer, or following steamer of this line, for which the goods shall arrive *in time.*" The same purpose is further shown in the last clause above quoted from the bill of lading, to-wit, "in the event of said steamer being prevented, from any cause, from proceeding in the ordinary course of her voyage, to have liberty to tranship the goods by any other steamer."

The words "said steamer," in the clause just quoted, cannot reasonably be construed as referring to the steamer Canada alone; for, upon that construction, if, when these goods arrived in London, the Canada had just sailed, the goods would be obliged to wait until she had reached New York and returned to London and was ready to sail again. On the contrary, the earlier clause in the bill of lading, above quoted, clearly provides for transhipment upon the earliest steamer for which the goods should arrive *in time.* The fair meaning of this clause, I think, renders such shipment upon the "following steamer of this line" obligatory, without waiting for a return of the Canada. The words "said steamer" in the last clause refer, therefore, not merely to the Canada, but to any other steamer of the respondents' line upon which, under the preceding clause in the bill of lading, the goods might lawfully be transhipped. If, with this construction, we take into further consideration the notice upon the margin of the bill of lading, that a steamer of the line sailed every Wednesday, and the further presumption that the shipper at Marseilles shipped his goods upon the faith of the ordinary course of departure previously in use by the respondents, as well as on the faith of this printed notice, it seems clear that the intention of this bill of lading was to provide that the goods in question should be forwarded in the ordinary course of shipment, and without any unnecessary delay, from any cause whatever, and be transhipped upon the Canada, or upon whichever other vessel of the respondents' line would, in the usual course of departure, sail next after the arrival of the goods in London; and that if, from any cause, the steamer that would ordinarily sail upon the next usual sailing day, after the arrival of the goods, should be "prevented from commencing or pursuing her voyage," etc., then that the respondents were to have liberty to tranship the goods by "any other steamer," for the purpose of expediting the goods to their destination.

When these goods arrived in London, the two steamers that in the respondents' usual course of business would have followed upon their regular trips to New York, had been chartered to the government for military purposes. It does not, indeed, appear whether the charter was voluntary or involuntary; but, whether the one or the other, their being chartered to the government prevented their sailing for New York upon the usual days. One of them would ordinarily have sailed on or about the thirteenth. The charter prevented her sailing, and "proceeding in the ordinary course of her voyage," and the respondents, therefore, had liberty to tranship the goods by any other

steamer. If the charter were the respondents' voluntary act, it was not unlawful as respects the libelants, nor any breach of the implied terms of the bill of lading. The respondents were not bound, under the alternative provisions of this bill of lading, to keep all their vessels in use on this line. These various alternative provisions seem to me clearly to indicate that they were to have the right to substitute other steamers, whatever might be the cause that should prevent any of their vessels from sailing on the sailing days, even though that cause were a diversion to other employments upon some special occasion on which the respondents' interest might make it expedient to employ their ships.

Again, the evidence shows that the customary mode of business in regard to the transhipment of goods on through bills of lading in London at this time was to require diligence in the dispatch of goods; and if there was likelihood, through any irregularities in the sailing of the steamers, of a detention above a week in the usual time of sailing, to forward the goods by some other line. The testimony on the part of the respondents shows that this usage was regarded as obligatory. In construing bills of lading, as in construing other commercial instruments, it is the right and duty of the court to look not only to the language employed, but to the subject-matter, and to the surrounding circumstances, in order to determine the proper effect of the language used, by putting itself, so far as possible, in the place of the contracting parties. It has regard, therefore, to all the prevailing usages and customs of business. *Mobile & M. Ry. Co.* v. *Jurey,* 111 U. S. 584, 592; S. C. 4 Sup. Ct. Rep. 566; *Nash* v. *Towne,* 5 Wall. 689, 699; *Robinson* v. *U. S.* 13 Wall. 363; *Hostetter* v. *Gray,* 11 Fed. Rep. 179. The forwarding of goods, also, with reasonable dispatch is at the present day a recognized obligation of common carriers. The various provisions of the bill of lading seem everywhere to imply a recognition of this obligation, and to be drawn with reference to it. In the light of this obligation, and of the proved usages of business, the provisions of this bill of lading are consistent; and, as it seems to me, they required the respondents to do precisely what they did do, in this case, namely, to ship the goods by some other steamer of at least equal rating, on or about the time when the next following steamer of their own line, after the arrival of these goods in London, would have sailed, had she not been prevented from pursuing her ordinary voyage through her charter to the British government. Under the provisions of the bill of lading alone, and more emphatically in connection with the usage proved, the respondents would have been guilty of a dereliction of duty, and would have been, as I think, responsible for any damages that might have happened to these goods, had they been detained in London until the sailing of the Canada some two weeks after they were forwarded by the City of London. *Broadwell* v. *Butler,* 6 McLean, 296; 1 Newb. 171; *Dorris* v. *Copelin,* 5 Amer. Law Reg. (N. S.) 492.

It is, doubtless, essential to the interests of the shipper that the carrier's contract shall be strictly construed in regard to the transhipment of goods, according to the provisions of the bill of lading. The shipper has a right to rely upon these provisions, in effecting insurance upon his goods; and any change of vessel contrary to the provisions of the bill of lading will, ordinarily, invalidate policies of insurance effected under it. But these considerations are not applicable to bills of lading in which the substitution of other vessels is clearly provided for, and still less in circumstances where the known usages of trade also demand a transfer to some other vessel, for the purpose of expediting the delivery of the goods. In such cases, the shipper has full notice of the liability to a change of vessel; he contracts in reference to it, and he must therefore protect his insurable interests accordingly. *Red Wing Mills* v. *Mercantile Ins. Co.* 19 FED. REP. 115; *Crosswell* v. *Mercantile Mut. Ins. Co.* 19 FED. REP. 24.

The libel should therefore be dismissed, with costs.