PACIFIC COAST CO. et al. v. YUKON INDEPENDENT TRANSP. CO.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1907.)

No. 1,377.

1. SHIPPING—SUIT FOR DAMAGE TO CARGO—LIMITATION IN BILLS OF LADING.
    Provisions of bills of lading requiring claims for loss or damage to cargo to be presented to the carrier within a stated time, and barring any suit for such loss or damage unless commenced within a further stated time, will be enforced by the courts only so far as they are reasonable under the circumstances of the particular case, and such requirements may also be waived by the carrier by his conduct.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 493, 496.

    Limitation of owners' liability, see note to The Longfellow, 45 C. C. A. 387.]

2. SAME—WAIVER OF LIMITATION.
    Libelant shipped cargo on respondent's vessel from Seattle to St. Michaels, Alaska, under a clear verbal agreement that it should be delivered on the first trip of the vessel in the spring, or as soon as the ice

was out of the harbor. When the vessel arrived the harbor was still closed by ice, and the vessel, after tendering delivery at Nome, returned to Seattle with the cargo on board, and delivered it on the next voyage. The bills of lading provided that all claims for damages should be presented to the carrier within 10 days from notice thereof, and that no action should be brought after 60 days. When the vessel decided to return from Nome with the property on board, libelant's agent served notice that a claim would be made for such damages as might result, and, when the goods were finally delivered at St. Michaels, served as specific a claim for damages as could then be made, and a more specific claim was later presented in Seattle, which respondent took under consideration, and negotiations for settlement were continued for a year before suit was brought. *Held,* that libelant had made reasonable compliance with the terms of the bills of lading as to notice, and that the delay in bringing suit was waived by the carrier by entertaining the claim and continuing negotiations for its settlement.

**3.** SAME—CONSTRUCTION OF BILLS OF LADING—EVIDENCE.

In construing and giving effect to the provisions of a bill of lading, the conditions and circumstances which the evidence proves were known to the parties and contemplated by them in making it are to be taken into consideration.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 416, 417.]

**4.** SAME—"DEVIATION" BY VESSEL.

A provision of bills of lading giving the vessel the right to "deviate" does not authorize her, after arriving at the port of delivery, to return to the port of shipment with the goods on board, and thence make a second voyage to the port of delivery, which is not a deviation, but an abandonment of the voyage so far as relates to such shipment.

**5.** SAME—BREACH OF CONTRACT OF AFFREIGHTMENT.

Libelant contracted with respondent for the carriage of goods from Seattle to St. Michaels, Alaska. It was fully understood that libelant intended to market the goods along the Yukon river as soon as the ice went out, and that it had a vessel awaiting at St. Michaels for the purpose. It was agreed that the goods should be taken on the first trip of respondent's vessel north, and should be delivered as soon as the ice was out of the harbor at St. Michaels, which was known to be usually about the 1st of July. Libelant refused to ship without such agreement. The bills of lading, which were issued after the cargo was on board, provided that in case the vessel should be prevented by stress of weather or otherwise from entering the port of delivery, the carrier might convey the property to the nearest or other port, and thence return it to the port of delivery by the same or other vessel, subject to the contract for the original voyage and at the risk of the owner. The vessel reached St. Michaels June 20th, and, finding the harbor filled with ice, returned to Nome, and there tendered delivery at ship's tackle, which being refused she returned to Seattle, and delivered the goods at St. Michaels on her next trip on July 19th. The ice went out of the harbor about July 1st. *Held,* that the vessel was bound by the contract of affreightment to wait until the ice went out or to transship the goods at Nome to be delivered at St. Michaels as soon as the harbor was free, at her own expense, and that she was liable for the damages caused by her breach of contract.

**6.** SAME—LIMITATIONS OF LIABILITY IN BILLS OF LADING—EFFECT OF ABANDONMENT OF VOYAGE.

In such case provisions of the bills of lading that the carrier should not be required to deliver at any particular time or to meet any particular market, and limiting its liability for damage to cargo, were applicable only to the original voyage, and it lost the benefit of them when it deliberately abandoned such voyage.

**7. SAME—CONTRACT OF AFFREIGHTMENT—BILLS OF LADING.**

A parol contract for the shipment of goods, pursuant to which they were laden on board, may be shown to affect the construction of bills of lading signed and delivered after the goods were loaded and when the vessel was about to sail, and, in order that provisions of such bills shall override the prior agreement, the burden rests on the carrier to show that they were called to the attention of the shipper and assented to by him.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

The appellee caused the steamship Senator to be libeled because of the breach of a maritime contract for the carriage of goods upon the steamship Senator from Seattle, consigned to the steamer Monarch at St. Michaels, at the mouth of the Yukon river. The goods consisted of a large quantity of merchandise, including perishable articles. The contract was made after negotiations between the representatives of the appellee and the appellants, with the understanding that the goods were intended for early sale in the Yukon river markets, and that the delivery was to be made as soon as the Senator should arrive at St. Michaels, or as soon as navigation was open in that harbor. The shipments were made about the end of May, 1901, and the voyage was the first of the season. It was known by the contracting parties that uncertainty existed as to whether the harbor of St. Michaels would be free of ice on the steamship's arrival, and that usually the harbor was not accessible before about the 1st of July. The Senator, on her way to St. Michaels, arrived at Nome on June 16th. After discharging two-thirds of her cargo at that port, she proceeded with the remainder, which was the merchandise consigned to the Monarch, and arrived off Golovin Bay on the morning of June 20th. Golovin Bay was found to be filled with ice, and, after cruising up and down off the face of the ice and making attempts to force a passage through it to St. Michaels, the Senator on the morning of the 21st returned to Nome, and there her master offered to a representative of the appellee to make delivery at ship's tackle. This offer was declined. The Senator then left Nome for Seattle, and reached that port on July 3d. On July 7th she departed from Seattle on a second voyage, having the appellee's cargo still on board. She went to Nome and thence to St. Michaels, where she discharged the cargo to the steamer Monarch on July 19th. The ice had left the St. Michaels Harbor about July 1st, and, if the Senator had remained off that port on her first voyage until July 2d, she could then have entered the harbor and discharged the cargo. The suit was brought to recover damages for loss on the goods and delay to the steamer Monarch. The District Court held that the Senator, by returning to Seattle without making delivery on the first voyage, made a breach of the contract of affreightment, and held the appellants liable to damages in the sum of $12,119.75, of which $4,119.75 was for loss on the goods, and $8,000 was for the delay of the steamer Monarch. The bills of lading contain the following provisions:

"Shipped by —————— per Pacific Coast Steamship Co. (hereinafter called carrier), to be forwarded per Steamer Senator or per some other of the carrier's steamers, or per some other steamer or steamers in the employ of said carrier, the articles or property enumerated hereon in apparent good order, except when otherwise noted, the value, weight, quantity, quality and condition of contents being unknown to said carrier, to be forwarded with as reasonable dispatch as the general business of the carrier will permit, and delivered at vessel's tackle at the port, place or landing of St. Michaels in like apparent good order (but with the option to the master to carry the property on deck, to deviate and to lighter, surf, transship, land and reship the said property or any thereof and to stop and land and receive passengers and freight at intermediate ports or places)."

"The property shall be received by the consignees thereof at the vessel's tackle immediately on arrival of the vessel at the port or place of delivery, without regard to weather; if the consignee is not on hand to receipt the property as discharged, then the carrier may deliver it to the wharfinger, or other party or person believed by said carrier to be responsible, and who will

take charge of said property and pay freight on same, or the same may be kept on board or landed and stored in hulks, or put in lighters by the carrier, at the expense and risk of the owner, shipper or consignee, and at his or their risk of any nature whatever."

"And further, that in case the vessel should be prevented by stress of weather or other cause from entering the port or place of delivery, or from discharging the whole or any part of her cargo there, the said property may, at the option of the master or agent, be conveyed upon said vessel to the nearest or other port, and thence returned to the port of delivery by the same or other vessel, subject to all the provisions of this contract in regard to the original voyage, and at the risk of the owner, shipper or consignee of said property."

"The carrier shall not be required to deliver the property at the port of delivery at any specific or particular time, or to meet any particular market."

"If in the judgment of the master of carrier's steamer it shall be impracticable or unsafe to land this freight at Nome on account of ice or weather, carrier may return same at owner's risk. On freight so returned same charges to be paid as if landed at Nome, but with no additional freight charge for returning to Seattle."

The evidence showed that the negotiations for the shipment of the cargo commenced as early as May 12, 1901. H. V. V. Bean, manager of the appellee, called on C. W. Miller, assistant general agent of the Pacific Coast Steamship Company at Seattle, and asked for freight rates for the first voyage of the Senator to St. Michaels, and informed him that, if the goods were taken, delivery must be made on the first voyage, as it was desired to reach the early market on the Yukon river. Mr. Miller replied that the ice might not be out of the St. Michaels Harbor when the steamer arrived, to which Mr. Bean replied that he wanted it understood that delivery must be made at St. Michaels on that voyage, and that otherwise the goods would not be shipped. After that conversation there were others, in which Mr. Miller was informed that the goods were largely perishable, and that the steamer Monarch was to come down the Yukon river to receive them at St. Michaels. He finally sent word to an agent of the appellee that he would take the goods and make delivery on the first trip of the Senator. It was arranged that Geo. R. Fisher, a representative of the appellee, should accompany the vessel to direct the delivery. After the vessel had arrived off the port of St. Michaels, and had remained there about thirty hours, the master told Fisher that he did not know how long he might have to wait, that he could not afford to remain there, and that he would have to take the goods back, but he offered to remain there two days if the appellee would pay the sum of $500 a day for the time of such delay. This Fisher declined, and he demanded delivery at St. Michaels. The evidence was that there was no danger or difficulty in remaining there if a good lookout were kept. The master testified that to remain outside the ice, but in the vicinity would not have subjected the ship to any particular danger, but it would have subjected her to a great deal of detention. The testimony was that on returning to Nome, on June 21st, the master, after consulting the appellant's agent there, offered to make delivery of the cargo at ship's tackle at that port, the appellee to pay lighterage charges and cost of transportation of the cargo thence to St. Michaels. This was refused.

Samuel H. Piles, James B. Howe, and Charles H. Farrell, for appellants.

Richard A. Ballinger, James T. Ronald, Alfred Battle, Albert J. Tennant, and Ira A. Campbell, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is assigned that the District Court erred in not dismissing the libel for the failure of the appellee to present its claim within the 10-day

period prescribed in the bills of lading, and for its failure to begin the suit within 60 days thereafter, as required by the bills of lading. The bills of lading provided that:

"All claims for damages to or loss of any property to be presented to the carrier within ten days from the date of notice thereof (the arrival of the vessel at port or place of discharge or the knowledge of stranding or loss of vessel to be deemed notice), and that after sixty days from such date no action, suit or proceeding in any court of justice shall be brought for any damage to or loss of said property; and that failure to present such claim within said ten days, or to bring suit within said sixty days, shall be deemed a conclusive bar and release of all right to recover against the vessel or its master, said carrier or any of the stockholders thereof, for any loss or damage."

The binding force of such a stipulation is recognized by the courts, provided that thereby a reasonable time is given to comply with its conditions. The Queen of the Pacific, 180 U. S. 49, 21 Sup. Ct. 278, 45 L. Ed. 419; Ward v. Mo. Pac. Ry. Co., 158 Mo. 226, 58 S. W. 28; Soper v. Pontiac, etc., R. Co., 113 Mich. 443, 71 N. W. 853. In the case of The Queen of the Pacific, the court said:

"It is unnecessary to say that if, under the circumstances of a particular case, the stipulation were unreasonable or worked a manifest injustice to the libelants, we should not give it effect."

In the Westminster (D. C.) 102 Fed. 366, it was said that the purpose of the claim of loss is to notify the carrier that the goods have been injured, and that it is charged with liability therefor. The evidence is that when the master of the Senator and the agent of the appellants at Nome decided to abandon the first voyage, and return to Seattle without delivering the goods at St. Michaels, the appellees served notice upon them that claim would be made for any loss that might result from such delay. At that time it was impossible for the appellee to state even approximately the loss which it would sustain. At the time when the goods were, on the second voyage, delivered to the Monarch, Mr. Bean protested against their condition, both to the master and to the appellants' agent, and served upon them as specific a claim for damages as could then be made. The extent of the damage to the goods was not known, and could not be known, until afterwards, and when the Monarch had made two round trips on the river and disposed of the goods. Thereafter Mr. Bean came out from Alaska, and a further claim, specifying the damages, was presented to the appellants' agent in Seattle. The agent made answer that the claim would have to be sent to the appellants' office in San Francisco and there be taken up. This was in October, 1901. Thereafter until October 8, 1902, negotiations were carried on between the parties looking to a settlement of the loss, during which the appellants gave no answer to the demand of the appellee, save to object to the amount thereof as unreasonable. On October 8, 1902, the suit was commenced. It is well settled that the requirement as to the presentation of such a claim, and the institution of suit to enforce the same within the time specified in the contract, may be waived by the carrier by entertaining the same and negotiating concerning its adjustment. Soper v. Pontiac, etc., R. Co., 113 Mich. 443, 71 N. W. 853; Hudson & Co. v. N. P. Ry. Co., 92 Iowa, 231, 60 N. W. 608, 54 Am. St. Rep. 550; Wabash Ry. Co. v. Brown,

155 F.—3

152 Ill. 484, 39 N. E. 273; Watch Case Co. v. Express Co., 120 N. C. 351, 27 S. E. 74; Wood v. Southern Ry. Co., 118 N. C. 1056, 24 S. E. 704. Upon the evidence in the case, we find no error in the refusal of the District Court to dismiss the cause for the appellee's failure to comply with that provision of the contract of affreightment.

It is assigned as error that the District Court disregarded certain provisions of the bills of lading, for the reason that they were printed in type so small as to be unreadable by persons having only ordinary powers of vision, and this in the face of the fact that the appellee made no showing or contention that the bills of lading were not read or understood or assented to when received. Upon a careful inspection of the rulings and opinion of the court, we find no basis for this assignment of error. It is true that in the opinion the court alluded to the fact that certain provisions of the bills of lading were printed in type so minute as to be illegible by persons of ordinary vision, but we do not discover that on that ground any portion of the bills of lading was rejected. The court said:

"For this reason the courts are compelled, when called upon to enforce them, to construe such contracts fairly, and to reject stipulations which are unreasonable, and to deny carriers all unfair advantages claimed by reason of exemptions from liability for negligence or plain violation of the carrier's obligation. In order to give a fair construction to a contract, all its parts must be considered, and conditions and circumstances which the evidence proves were known to the parties and contemplated by them in making it."

This doctrine is well sustained by the authorities, and is applicable to bills of lading, no matter in what kind of type they are printed. In Marx v. National Steamship Co. (D. C.) 22 Fed. 680, Judge Brown thus expressed the recognized rule of construction:

"In construing bills of lading, as in construing other commercial instruments, it is the right and duty of the court to look, not only to the language employed, but to the subject-matter and to the surrounding circumstances, in order to determine the proper effect of the language used, by putting itself so far as possible in the place of the contracting parties."

Did the court err in construing the contract? The appellants contend that it was error to hold that the Senator, after having attempted and failed to make an entrance through the ice into the harbor of St. Michaels, did not have the right to proceed to Nome, and thence back to Seattle, and from that port to return to St. Michaels, and that to do so constituted a deviation not permitted by the bills of lading. The bills of lading authorized the steamship to deviate, but it is very clear, we think, that after arriving at the port of delivery to return to the port of shipment, and thence make a second voyage to the port of delivery, is not a deviation as that term is used and understood in maritime law. Deviation is variously defined. Generally speaking, it is a voluntary departure without necessity or reasonable cause from the regular and usual course of the voyage. 14 Cyc. 282; Hostetter v. Park, 137 U. S. 30, 11 Sup. Ct. 1, 34 L. Ed. 568; Constable v. National Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903. By returning to Seattle from Nome, the Senator abandoned her voyage, so far as it concerned the appellee, and, when she subsequently carried the goods to the port of delivery, it was by a sec-

ond voyage, and not by the voyage contemplated in the contract. The bills of lading, while they gave the right to deviate, contain special provision as to the permissible course of the appellants in the event that stress of weather or other cause should prevent the entrance of their vessel into the port of delivery. It provided that, in such a case, the cargo might, at the option of the master or agent, be conveyed upon said vessel to the nearest or other port, and thence returned to the port of delivery by the same or other vessel, subject to all the provisions of the contract in regard to the original voyage, and at the risk of the owner, shipper, or consignee. By this provision, the appellants were given the right, under the circumstances disclosed in the evidence, to carry the goods from off St. Michaels Harbor to Nome, and thence to carry them back to St. Michaels or to ship them to that port upon another vessel. They pursued neither course. They offered to deliver the goods to the appellee at Nome, but at ship's tackle, and they declined to assume the expense of lighterage or carriage to St. Michaels. The offer was not a compliance with the obligation of the contract, by the terms of which the appellants were bound to deliver the goods of St. Michaels at their own expense, notwithstanding the provision that the carriage from Nome to St. Michaels was to be at the owner's risk. In Luduc v. Ward, 20 Q. B. Div. 475, Lord Esher, M. R., said:

"In the present case liberty is given to call at any ports in any order. It was argued that that clause gives liberty to call at any port in the world. Here, again, it is a question of the construction of a mercantile expression used in a mercantile document, and I think that as such the term can have but one meaning, namely, that the ports, liberty to call at which is intended to be given, must be ports which are substantially ports which will be passed on the named voyage."

A well-considered case in point is Swift & Co. v. Furness, Withy & Co. (D. C.) 87 Fed. 345. In that case the libelant shipped fresh beef from Boston to London, under bills of lading which gave the vessel liberty to make deviation and to call at any intermediate port or ports for any purpose. The bills of lading also provided that the beef was to be shipped wholly at the risk of the shipper, and that the owners of the vessel assumed no responsibility whatever therefor during the voyage, and were not to be held liable for loss or damage thereto. The voyage ordinarily took from 14 to 16 days. On arriving at Dover the ship was ordered to go to Havre and discharge part of her cargo. From Havre she went to Flushing, Holland, thence back to London, where she arrived several days later, with the beef in a damaged condition. The court, in denying the vessel exemption from liability on the ground that her deviation was permissible under the bills of lading, said:

"Under both bill of lading and marine insurance policy, reasonable, necessary, and contemplated deviations are permitted. Unreasonable, unnecessary, and arbitrary deviations are held breaches of contract. The clause providing that 'meat is to be shipped wholly at the risk of the shipper, and that the owners assume no responsibility therefor during the voyage,' etc., does not afford the carrier protection for damage arising after the vessel was diverted from her voyage, and sent upon what must be regarded as an additional and independent voyage to Havre and Flushing. This clause refers to the voyage contemplated by the parties, and to deviations reasonably incident thereto, not to an additional voyage arbitrarily made by the order of the owner."

The case at bar presents stronger ground, for the application of that doctrine than did the case in which it was announced.

The clause of the bills of lading providing that if, in the judgment of the master of the steamship, it should be impracticable or unsafe to land freight at Nome on account of ice or weather, the freight might be returned to Seattle, does not avail the appellants in the present case, whether that provision be regarded as a part of a printed form applicable only to consignments of freight from Seattle to Nome and therefore not pertinent to the present contract, or whether it be regarded as a provision of the contract intended for the protection of the steamship in the event of her return to Nome after an unsuccessful attempt to reach anchorage ground at St. Michaels. In either view, it is the expression of the whole of the intention of the parties as to the right of the vessel to return to Seattle without delivering the goods. It is inapplicable here for the reason that, in fact, it was not impracticable or unsafe to land freight at Nome on account of either ice or weather. In the light of the circumstances attending the execution of the contract, and the provisions of the bills of lading, we think it is clear that the appellants were under obligation to deliver the goods upon their own or another vessel at St. Michaels as soon as that harbor was free from ice. The appellants could have been absolved from that obligation only upon the occurrence of an unforeseen event. It was not unforeseen that the vessel might be delayed on account of the ice. It was well known to both the contracting parties that the ice rarely left St. Michaels Harbor before the 1st of July. The contract was made with special reference to that contingency. The necessity of the delay or of transshipping the goods at Nome was fairly within the intention of the agreement, and the risk thereof must be presumed to have been compensated for by the freight money which the appellants received.

It is contended that the District Court erred in holding the appellants liable for damage for the decay of perishable goods when the bills of lading provided that they should not be responsible for the decay of perishable articles or damage to any article "arising from the effect of heat or cold, sweating, or fermentation." The answer to this contention is that the limitations of liability expressed in the bills of lading were applicable only to the voyage contemplated in the contract. They do not relieve the carrier from liability for damages resulting from the delay occasioned by the abandonment of the voyage and the return of the vessel to Seattle. 6 Cyc. 383; Balien & Son v. Jolly, Victoria & Co., Ltd., 6 T. L. R. 345; Luduc v. Ward, 20 Q. B. D. 475. In the latter case the court said:

"It follows that when the defendant's ship went off the ordinary track of a voyage from Fiume to Dunkirk to a port not on the course of that voyage, such as Glasgow, there was a deviation, and she was then on a new voyage, different from the one contracted for, to which the excepted perils clause did not apply, and therefore the ship owner is responsible for the loss of the goods."

It is contended, further, that there was error in holding the appellants liable for delay in delivering the goods, and in allowing demurrage to the Monarch contrary to the provision in the bills of lading that the

carrier shall not be required to deliver property at the port of delivery at any specified or particular time or to meet any particular market. The foregoing considerations and the authorities just quoted are applicable also to this provision of the bills of lading, and to the further clause thereof, providing that claim for loss or damage to any of the property shall be restricted to "the cash value of the same at the port of shipment at the date of shipment unless otherwise agreed." The benefit of all of these provisions was forfeited by the appellants by their act in causing the Senator to return to Seattle without making delivery of the goods on the voyage upon which they were to have been delivered. For breach of that contract the appellee was entitled to damages for the loss of the market, with a view to which the contract was made. Mobile & Montgomery R. Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527; The Arctic Bird (D. C.) 109 Fed. 167; Port Blakeley Mill Co. v. Sharkey, 102 Fed. 259, 42 C. C. A. 329.

The appellants earnestly contend that the court erred in admitting evidence of a prior parol agreement between the parties which tended to modify the terms of the bills of lading. The evidence so admitted tended to prove the negotiations antecedent to the shipment and the common understanding that the appellants intended to take advantage of the market prices prevailing at points on the Yukon river at the opening of navigation. It tended to show that the probable presence of ice in the St. Michaels Harbor was contemplated, and that the contract was made with the special understanding that delivery was to be made as soon as the harbor was free from ice. It showed, also, that the bills of lading were signed late at night, and at about the last minute before the boat went out. All of this evidence was admitted for the purpose, not of modifying the provisions of the bills of lading, but of showing the intent and purpose of the contracting parties, and aiding the court to construe the bills of lading with reference to that intent. The bills of lading were printed forms applicable to different consignments of goods to different ports. In Hutchinson on Carriers (3d Ed.) § 622, it is said:

"But the main object and intent of the contract is the voyage agreed upon, and, while the printed general words must not in construing a contract be discarded, it is well recognized that, when considering what the main object and intent of the contract is, it is proper to bear in mind that a portion of each is on a printed form applicable to many voyages, and is not especially agreed upon in relation to the particular voyage."

See, also, Marx v. National S. S. Co. (D. C.) 22 Fed. 680; Mobile & Montgomery R. Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527.

But if, indeed, the parol testimony so admitted in evidence did have the effect to modify some of the provisions of the bills of lading, it was, under the circumstances disclosed in this case, admissible for that purpose, for the bills of lading were issued after the goods had been delivered on board the Senator, and after they had passed from the control of the shipper, and the vessel was about to go on her way. The burden was then upon the carrier to show that its agents directed attention to the terms of the bills of lading and that the shipper assented

to them. The Arctic Bird (D. C.) 109 Fed. 167; Bostwick v. B. & O. R. Co., 45 N. Y. 712; Strohm v. Detroit & M. Ry. Co., 21 Wis. 562, 94 Am. Dec. 564; Mo. Pac. Ry. Co. v. Beeson, 30 Kan. 298, 2 Pac. 496; Michigan Central R. R. Co. v. Boyd, 91 Ill. 268.

We find no error for which the decree should.be reversed. It is accordingly affirmed.