## EL DORADO OIL WORKS CO. v. SOCIÉTÉ COMMERCIALE DE L'OCEANIE.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1910.)

No. 1,832.

1. SALES (§ 72*)—CONSTRUCTION OF CONTRACT—SUBJECT-MATTER—IDENTIFICATION.

Plaintiff contracted in writing to sell to defendant a full cargo of Tahiti copra of fair average quality, to be delivered on quay in San Francisco "per brig Lurline now en route from Puget Sound to Taiohae and/or Papeete, what the vessel loads, estimated to be about 350 tons." *Held,* that such contract did not require that the cargo should be loaded at Papeete, nor that the vessel should sail from that port direct to San Francisco, and the fact that, being unable to obtain a full cargo there, she returned to Taiohae and completed loading, sailing thence for San Francisco, did not entitle defendant to refuse to receive the cargo on the ground that it was not the copra contracted for, nor because the vessel deviated from her voyage on her return; the copra being of the quality called for and delivered within a reasonable time, which was all that could be required under the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 197–202; Dec. Dig. § 72.*]

2. EVIDENCE (§ 448*)—EXTRINSIC EVIDENCE AFFECTING WRITTEN CONTRACT—PRIOR NEGOTIATIONS.

Such contract was not ambiguous, and previous correspondence between the parties, while properly admitted in evidence in an action for breach of the contract by defendant by refusing to accept the copra on the issue as to whether the delivery was within a reasonable time, was not admissible to alter the terms of the written contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066–2082; Dec. Dig. § 448.*]

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of California.

Action by the Société Commerciale de L'Oceanie against the El Dorado Oil Works Company. Judgment for plaintiff, and defendant brings error. Affirmed.

On October 9, 1907, the agents of the defendant in error at San Francisco wrote to the agents of the plaintiff in error, directing their attention to the fact that the brig Lurline was expected to be dispatched from Papeete to San

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Francisco, where her arrival was expected on or about December 15th, and offering a cargo of Tahiti copra, of which it was said the Lurline could carry from 300 to 350 tons. On the following day a second letter was sent, stating that the Lurline left Puget Sound on October 5th, bound for Papeete, and that "we figure that she should reach San Francisco on her return voyage about December 16, 1907." Thereupon, on October 11th, the following contract was entered into: "The Société Commerciale de L'Oceanie agree to deliver in sacks or in bulk, their option, and the El Dorado Oil Works Company agree to receive, a full cargo of Tahiti copra of fair average quality, tale quale on quay in San Francisco, per brig Lurine, now en route from Puget Sound to Taiohae and/or Papeete what the vessel loads, estimated to be about three hundred and fifty (350) tons (2,240 lbs. each). If delivered in bulk, buyers to furnish sacks which are to be filled and sewed by the seller. The El Dorado Oil Works Company agree to pay for the copra delivered under this contract at the rate of four (4) cents per lb. gross weight delivered, sacks included if delivered in sacks. Payment to be made in cash, United States gold coin, on completion of delivery in San Francisco. Present or future duties, war revenue tax, or any new charges that may be imposed by the United States government for account of buyers. Should the goods, or any portion thereof, be transhipped, and arrive in any other vessel or vessels, contract still to hold good. In case of loss of vessel, contract to be void."

On the day when the contract was signed, the brig was en route from Puget Sound to Taiohae or Papeete, or both, a few days out, laden with a cargo of lumber, as both parties to the contract were aware. The Tahiti copra is copra produced in the Society Islands or in the Marquesas Islands. The brig sailed to Taiohae, and thence to Papeete, where she arrived on December 1, 1907. At that port she loaded part of her cargo of copra, and on December 17th she sailed for a voyage back to Taiohae, where she completed the loading of her cargo of copra on January 20, 1908. On the following day she sailed on her return voyage to San Francisco, and she arrived at that port on February 22, 1908, with a full cargo of copra of the stipulated quality on board. When the cargo was tendered to the plaintiff in error, the latter refused to accept the same, and thereupon the present action was brought to recover under the contract. The case was tried before a jury, and a verdict was returned for the defendant in error.

Page, McCutchen & Knight, for plaintiff in error.

Andros & Hengstler, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). Error is assigned to the instructions given by the court as to the meaning and purport of the contract, and to refusals to instruct as requested by the plaintiff in error. It is unnecessary to set out in detail the instructions so given and requested. They all raise the question of the correct construction of the contract. In brief, it is the contention of the plaintiff in error that the article tendered by the defendant in error was not the very article itself which was purchased. By this it is not meant that it was not a full cargo of Tahiti copra of fair average quality, tale quale, delivered on the quay in San Francisco per brig Lurline, but that it was not the article purchased, for the reason that it was not a cargo brought directly from Papeete as warranted in the contract, but was a cargo brought by a voyage which was an unauthorized deviation from the return voyage, which was described in the contract. This leads us to the question of the construction of the contract. Certain of its features are made so clear as to be beyond controversy. One is that the brig was warranted, at the time when

the contract was made, to be en route from Puget Sound to Taiohae and/or Papeete, and that such was her outward voyage, and that on that voyage she was permitted to visit Taiohae or Papeete or both.

But the plaintiff in error contends that, while the contract permitted the brig to visit either or both ports, it required her to visit them in the order in which they were named, and did not permit her to return to Taiohae after having once touched there on the way to Papeete, and that her return voyage should have been from the last-named port to San Francisco, and that she would so return without deviation was a warranty necessarily and legally implied in the terms of the contract. But the contract, as we read it, does not describe the return voyage, nor does it specifically name a port or ports of loading. It simply provides that the defendant in error shall deliver a cargo of Tahiti copra of fair average quality on the quay in San Francisco per brig Lurline, described to be "now en route from Puget Sound to Taiohae and/or Papeete." It is silent as to where the cargo was to be obtained, or as to what the return route should be.

But the plaintiff in error, in support of its contention that, by virtue of the deviation of the brig in visiting Taiohae the second time, the cargo offered was not the cargo contracted for, cites cases which hold that the goods offered must be identical with those bargained for, cases such as Ellis v. Thompson, 3 M. & W. 452, Filley v. Pope, 115 U. S. 213, 6 Sup. Ct. 19, 29 L. Ed. 372, Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, and Bowes v. Shand, 2 App. Cases, 455.

In Ellis v. Thompson the purport of the decision was that goods which at the date of the contract were to be loaded on barges, and carried thereby from Shrewsbury to Gloucester, were not the identical goods contracted for, and described as ready for shipment at Gloucester or Liverpool on that day. In Filley v. Pope the contract was for the sale of pig iron, "shipped from Glasgow." The court held it was not fulfilled by tendering pig iron shipped from Leith, and that in a mercantile contract a statement descriptive of the subject-matter or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty or condition precedent. In Norrington v. Wright the contract was for the sale and purchase of iron rails, to be shipped from a European port or ports to Philadelphia, at the rate of about 1,000 tons per month, beginning at a fixed date. The court held that the warranty was not fulfilled by the delivery of monthly shipments of quantities very materially less than those contracted for. In Bowes v. Shand it was held that a contract to sell rice, to be shipped during the months of March and April, is not fulfilled by tendering rice shipped in February. The Lord Chancellor said:

"If the description of the article tendered is different in any respect, it is not the article bargained for."

And he alluded to the fact that the contract was mercantile, and that merchants are not in the habit of placing in their contracts stipulations to which they do not attach some value and importance, and to the further fact that when making contracts for the purchase of rice

they may well be desirous that the rice should not be forthcoming to them at a time either earlier or later than that at which it suits them to be ready with funds for payment.

But what is there in the case at bar to show that the cargo tendered was different in any respect from that which was bargained for? The parties had not bargained for a cargo to be shipped from Papeete, or from any other named port, to San Francisco; nor had they bargained for a cargo to be loaded at any particular time or place, or to be delivered at any particular time. They had bargained for a full cargo of Tahiti copra to be delivered on the quay at San Francisco, and had contracted that it should be brought by the Lurline, described in the contract to be a "brig en route from Puget Sound to Taiohae and/or Papeete." If the contract had stipulated that the cargo should be taken on board at Taiohae or Papeete, and that the return voyage should be from either of those ports directly to San Francisco, a different case would be presented. But the parties saw fit to incorporate no such provision in the contract. The only contingency expressed in the contract, upon the happening of which the contract was to be held void, was the loss of the vessel, and the contract expressly permitted a transshipment of the cargo to one or more vessels.

The fact that the contract was silent concerning the time of the delivery of the cargo at San Francisco gives rise to the inference that the cargo was to be delivered within a reasonable time, and the fact that it was silent concerning the place or manner of loading creates the inference that the parties understood that the vessel was to be loaded according to the customs and usage of the ports of trade. There was evidence of such customs and usage, showing that as a general thing the ports at which sailing boats touch are hard to reach by mail, that a cargo is not always available, that sometimes the cargo is picked up at several ports, and that it is not always possible that a cargo shall be ready. There was evidence that a vessel leaving the coast in October with an outward cargo to be discharged in the islands, thereafter to load a cargo of Tahiti copra wherever she could find it and return to San Francisco, might reasonably be expected to occupy four months on the entire voyage. The instructions of the court properly submitted the question of a reasonable time to the decision of the jury.

The trial court ruled that the communications which passed between the parties prior to the signing of the contract could be admitted for the purpose of indicating to the jury what should be taken to be a reasonable time for the performance of the contract, but that they could not be taken to contradict the contract; and the court instructed the jury that the communications might be considered on the point of reasonable time. In one of those communications the plaintiff in error stated that the Lurline was expected to be dispatched from Papeete to San Francisco "some time this fall, and we look for her arrival in San Francisco on or about December 15th." In another the statement was made that the Lurline had left the sound on October 5th, bound for Papeete, "and we figure that she should reach San Francisco on her return voyage about December 16, 1907."

It is now insisted that those communications were admissible in evi-

dence to make clear the meaning of the terms of the contract. But, as we read the contract, we do not find that it is ambiguous or uncertain. It is presumed to express the full intention and agreement of the parties. If so, all prior negotiations were inadmissible to alter it. In Seitz v. Brewers' Refrigerating Co., 141 U. S. 517, 12 Sup. Ct. 46, 35 L. Ed. 837, the court held that, when the writing itself upon its face is couched in such terms as to import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking were reduced to writing, and that silence on a point that might have been embodied in the agreement does not open the door to parol evidence in that regard.

The plaintiff in error cites the case of Davison v. Von Lingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885. In that case a charter party made on the 1st of August in Philadelphia contained the stipulation that the vessel is "now sailed or about to sail from Benizaf with cargo for Philadelphia"; whereas the fact was that the steamer was in Morocco, only three-elevenths loaded, and did not sail for Philadelphia until August 7th, and left Gibraltar August 9th. Before signing the charter party, the charterers had asked to have in it a guaranty that the steamer would reach Philadelphia in time to load a cargo for Europe in August, but this was refused. They had declined to have inserted the words "sailed from or loading at Benizaf." On learning the date when the vessel left Gilbraltar, they proceeded to look for another vessel. The steamer was not unloaded at Philadelphia until September 7th. The charterers repudiated the contract. The court held that the stipulation "now sailed or about to sail," etc., was a warranty or a condition precedent, that time and the situation of the vessel were material and essential parts of the contract, and that the charterers had the right to repudiate the contract. The court said that the words "now sailed or about to sail with cargo" meant that she must have had her cargo on board and was ready to sail, and remarked that that construction was in harmony with all that occurred between the parties at the time and with the conduct of the charterers afterwards. It was not a case in which testimony was admitted to alter or vary the terms of a contract, and no such question is discussed in the opinion.

So in Pacific Coast Co. v. Yukon Transportation Co., 155 Fed. 29, 83 C. C. A. 625, decided by this court. Evidence of a prior parol agreement was referred to as tending to support the natural meaning of the bills of lading; but the court found no error in the admission of the parol agreement, principally upon the ground that the bills of lading were issued after the goods had been delivered on board the vessel, and after they had passed from the control of the shipper, and were not assented to, and hence could not have the force to set aside the prior parol agreement.

We find no error in the exclusion of evidence of prior communications to alter or explain the contract.

The decree is affirmed.

ROSS, Circuit Judge (dissenting). I respectfully dissent, being of the opinion that the written contract itself, rightly construed, means

that the copra contracted for was to be shipped from the termination of the outward voyage of the Lurline, which was Papeete, to San Francisco direct, and that the going of that vessel from Papeete to Taiohae, which, according to the record, consumed about 18 days, constituted a deviation from the voyage stipulated for by the parties. Such construction of the written contract is not contradicted, but rather confirmed, by the letters of the respective parties leading up to the making of the contract, as well as by letters passing between them subsequent to the making thereof, the latter of which tend to show the construction which each of the parties placed upon it.

The first of the letters prior to the contract was written October 9, 1907, and is as follows:

"San Francisco, October 9, 1907.

"Messrs. Geo. A. Moore & Co., Agents El Dorado Oil Works, 118 California Street, City—Dear Sirs: We beg to invite your kind attention to the fact that the brig Lurline—net registered measurement 336 tons—is expected to be dispatched from Papeete to San Francisco some time this fall, and we look for her arrival in San Francisco on or about December 15th. Under cable authority from our Hamburg friends, we are able to offer you a price of not less than 4¢ per lb., delivered on dock San Francisco, subject to the usual form of contract, for prospective cargo of average Tahiti copra by the opportunity in question. A conservative estimate of the quantity of copra the Lurline will carry seems to be 300/350 tons. The offer from our Hamburg friends is subject to prompt cable reply and prior sale. Therefore we hope to receive your early response to this letter.

"Yours faithfully,                              Williams, Dimond & Co."

The second of those letters from the agents of the plaintiff, which shows the acceptance by the defendant of its offer, is as follows:

"San Francisco, October 10, 1907.

"Messrs. Geo. A. Moore & Co., Agents El Dorado Oil Works, 118 California Street, City—Dear Sirs: Copra per Lurline: We have for acknowledgment your favor of October 9th in response to our letter of October 9th; contents noted with thanks. In conformity therewith we herewith beg to confirm sale to your good selves at the instance of mutual Papeete friends through authorization from their Hamburg office a cargo of average Tahiti copra per brig Lurline at the price of four cents (4¢) per lb., delivered on dock San Francisco, subject to the usual form of contract. The Lurline left the Sound October 5th bound for Papeete, and we figure that she should reach San Francisco on her return voyage about December 16, 1907. We estimate that the quantity of copra the Lurline will carry will amount to about 300/350 tons of 2,240 lbs. each. We shall wait upon you with contract in the course of a few days.

"Yours faithfully,                              Williams, Dimond & Co."

There is in this letter a clear indication that the copra sold to and accepted by the defendant was copra of Papeete parties, and was to be shipped from Papeete by the Lurline to San Francisco direct, which place, it is therein stated, the brig should reach about December 16, 1907.

Both the contract and the two letters above set out provided for a full cargo of the brig, estimated to be from 300 to 350 tons of 2,240 pounds each. The agreed statement of fact shows that the Lurline on her outward voyage arrived at Taiohae November 17, 1907, where she remained until November 25th, on which day she sailed for Papeete, arriving there December 1st, where she completed the discharge of

her outward cargo December 10, 1907. She was then in condition to undertake the contract in question, which, as shown by the contract, as well as the previous letters referred to, called for an exclusive cargo of copra, estimated to be from 300 to 350 tons of 2,240 pounds each. Instead of taking on the exclusive cargo of copra and returning to San Francisco with it, she took on, according to the agreed statement of facts, 105 tons of copra and a lot of "lumber and other freight for Taiohae," and set sail December 17, 1907, from Papeete for Taiohae, where she arrived January 9, 1908, and where she remained until January 20th, completing the loading of a cargo of copra on the 20th of January, 1908. The next day, January 21st, she sailed with it to San Francisco, where she arrived February 22, 1908. That this was such a deviation and departure from the terms of the contract on the part of the plaintiff as vitiated it, not only seems clear to me, but I think other letters of the parties introduced in evidence go to show that both of them understood the contract to provide for a full cargo of copra from Papeete direct to San Francisco. As it turned out, the seller could only get 105 tons of copra at Papeete, of which fact its San Francisco agents were evidently made aware, for on the day before the Lurline arrived at Papeete, to wit, November 16, 1907, they wrote to the plaintiff as follows:

"San Francisco, Nov. 16, 1907.

"Geo. A. Moore, Esq., President El Dorado Oil Works Co., San Francisco, Cal.—Dear Sir: As the writer expects shortly to return to New York, he deems it well to confirm conversation and understanding with you this morning with reference to contract with your company for a cargo of copra per Lurline. In accordance with this conversation, it is understood that your company is willing that the cargo of the Lurline should be less than her estimated full capacity of 300 or 350 tons, and that a delivery of as little as 100 tons by this vessel would be accepted as a satisfactory fulfillment of the contract. We also note your willingness at the present time to cancel the contract, but am not taking this matter up at present.

"Yours faithfully,            Williams, Dimond & Co."

The request of the plaintiff made to the defendant at that time to be relieved of its obligation to furnish the full cargo of copra sold, and to accept 100 tons as full delivery, is, I think, strong evidence of the fact that it understood the contract as binding it to ship the full cargo of from 300 to 350 tons from Papeete. And that such was the understanding of the defendant is further shown by its letter of January 29, 1908, to the plaintiff's San Francisco agents, in answer to a letter from them of the previous day, in which they wrote:

"Referring to contract dated October 11, 1907, negotiated by us on behalf of the Société Commerciale de L'Oceanie and your company, covering copra to arrive here per brig Lurline, we have received advices from our Papeete friends that the Lurline sailed from Papeete on December 14th with 105,027 kilos copra and proceeded to Taiohae to complete loading. As soon as we receive advices of the Lurline's departure from Taiohae, we will advise you."

The reply of the defendant was as follows:

"San Francisco, Jan. 29, 1908.

"Messrs. Williams, Dimond & Co., San Francisco, Cal.—Gentlemen: We beg to acknowledge the receipt of your favor of the 28th inst., by which we note that the brig Lurline sailed from Papeete on December 14th to Taiohae to

complete loading. As her arrival here will necessarily be so far behind the date contemplated in your letters of the 9th and 10th of October, upon which we made the purchase, through this diversion from her original trip, we should like an explanation of this change and consequent delay.

"Very truly yours,          Eldorado Oil Works, Geo. A. Moore, Pt."

To this letter the plaintiff's agents replied as follows:

"San Francisco. January 31, 1908.

"George A. Moore, Esq., Pres. El Dorado Oil Works, 118 California St., San Francisco—Dear Sir: We have for acknowledgment your favor of 29th inst. in reference to brig Lurline. The Lurline left Puget Sound on October 5th, as advised in our respects of October 10th, and the only delays she has met with, so far as we can ascertain, have been those experienced through acts of God, wind, and weather.

"Yours faithfully,                                    W., D. & Co."

In my opinion the defendant was under no obligation to accept the shipment in question, and therefore I think the judgment should be reversed, with directions to the court below to dismiss the action.